1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10    REGINALD SMITH,

11              Plaintiff,                    No. CIV S-06-2340 GEB DAD P

12        vs.

13    NAKU, et al.,

14              Defendants.                   FINDINGS AND RECOMMENDATIONS

15    _____/

16              Plaintiff is a state prisoner proceeding pro se with a civil rights action seeking

17    relief under 42 U.S.C. § 1983.  Pending before the court are motions for summary judgment

18    brought, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on behalf of defendants

19    Naku, McMaster and Noriega.  Plaintiff has filed an opposition to the motion and defendants

20    have filed replies.

21                              **BACKGROUND**

22              Plaintiff is proceeding on his second amended complaint (Doc. No. 25) against

23    defendants Naku, Noriega and McMaster.  Therein, he alleges as follows.[1]  For many years

24    _____

25         [1]  The factual allegations of plaintiff's second amended complain are somewhat difficult
      to decipher and the court has attempted to recount them in the most clear and concise manner
26    possible.

1   plaintiff has suffered from painful sores on his scalp that bleed.  On June 14, 2004, surgery was

2   ordered to address plaintiff's condition.  Defendants Naku and Noriega ignored that order and

3   refused to perform the procedure resulting in a lengthy delay in treating plaintiff's condition and

4   causing plaintiff unnecessary pain and suffering.

5           In February and March of 2006, plaintiff was infected with Helicobacter Pylori

6   ("H-Pylori").  The infection caused plaintiff stabbing pains in his stomach and resulted in blood

7   in his sputum.  When plaintiff attempted to seek treatment at a prison clinic defendant McMaster

8   had him escorted out of the clinic by an officer.  Moreover, defendant Naku did not provide

9   plaintiff with antibiotics to treat his H-Pylori infection until August 16, 2006.

10           Plaintiff claims that the defendants were negligent and that they have denied him

11   adequate medical care in violation of the Eighth Amendment.  (Sec. Amend. Compl. (Doc. No.

12   25) at 1-10.)[2]  Plaintiff seeks injunctive relief, as well as compensatory and punitive damages.

13   Id.

14                              PROCEDURAL HISTORY

15           On August 5, 2008, the court ordered the United States Marshal to serve

16   plaintiff's second amended complaint on defendants Naku, Noriega, Castrillo and McMaster.

17   (Doc. No. 41.)  Defendants Noriega and McMaster filed their answer on November 3, 2008 .

18   (Doc. No. 50.)  On November 13, 2008, the undersigned issued a discovery order.  (Doc. No. 51.)

19   On November 26, 2008, the court granted plaintiff's motion to dismiss defendant Castrillo from

20   this action.  (Doc. No. 55.)  On February 20, 2009, defendant Naku filed an answer.  (Doc. No.

21   58.)

22           On April 28, 2010, defendant Naku filed a motion for summary judgment, arguing

23   that he was entitled to judgment in his favor because: (1) there is no evidence that defendant

24   Naku was deliberately indifferent to plaintiff's medical needs; (2) defendant Naku is entitled to

25

26           [2] Page number citations such as this one are to the page number reflected on the court's
    CM/ECF system and not to page numbers assigned by the parties.

1  qualified immunity; and (3) plaintiff has failed to comply with California's Government Claims

2  Act.  (Doc. No. 88.)  On May 26, 2010, counsel for defendants Noriega and McMaster filed a

3  motion for summary judgment arguing that they were entitled to judgment in their favor because:

4  (1) there is no evidence that defendants Noriega and McMaster were deliberately indifferent to

5  plaintiff's medical needs; (2) defendants Noriega and McMaster are entitled to qualified

6  immunity; and (3) plaintiff has failed to comply with California's Government Claims Act.

7  (Doc. No. 93.)

8          Plaintiff filed an opposition to defendant Naku's motion for summary judgment

9  on August 4, 2010.  (Doc. No. 97.)  Defendant Naku filed a reply on August 6, 2010. (Doc. No.

10  99.)  On September 30, 2010, plaintiff filed an opposition to motion for summary judgment filed

11  on behalf of defendants Noriega and McMaster.  (Doc. No. 102.)  Defendants McMaster and

12  Noriega filed their reply on August 10, 2010.[3]  (Doc. No. 100.)

13                  **SUMMARY JUDGMENT STANDARDS UNDER RULE 56**

14          Summary judgment is appropriate when it is demonstrated that there exists "no

15  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

16  matter of law."  Fed. R. Civ. P. 56(c).

17              Under summary judgment practice, the moving party
                always bears the initial responsibility of informing the district court
18              of the basis for its motion, and identifying those portions of "the
                pleadings, depositions, answers to interrogatories, and admissions
19              on file, together with the affidavits, if any," which it believes
                demonstrate the absence of a genuine issue of material fact.
20

21  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

22  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

23  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

24  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

25  _____

26      [3]  In that reply counsel for defendants McMaster and Noriega responded to the arguments
    presented by plaintiff in his opposition to defendant Naku's motion for summary judgment.

after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

whatever is before the district court demonstrates that the standard for entry of summary

judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the

opposing party to establish that a genuine issue as to any material fact actually does exist.  See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

establish the existence of this factual dispute, the opposing party may not rely upon the

allegations or denials of its pleadings but is required to tender evidence of specific facts in the

form of affidavits, and/or admissible discovery material, in support of its contention that the

dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433,

1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party

need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

1  committee's note on 1963 amendments).

2  In resolving the summary judgment motion, the court examines the pleadings,

3  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

4  any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson,

5  477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the

6  court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587.

7  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

8  produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen

9  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

10  1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

11  show that there is some metaphysical doubt as to the material facts . . . . Where the record taken

12  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

13  'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

14  **OTHER APPLICABLE LEGAL STANDARDS**

15  I. Civil Rights Act Pursuant to 42 U.S.C. § 1983

16  The Civil Rights Act under which this action was filed provides as follows:

17  Every person who, under color of [state law] . . . subjects, or causes
    to be subjected, any citizen of the United States . . . to the
18  deprivation of any rights, privileges, or immunities secured by the
    Constitution . . . shall be liable to the party injured in an action at
19  law, suit in equity, or other proper proceeding for redress.

20  42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the

21  actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See

22  Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362

23  (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the

24  meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or

25  omits to perform an act which he is legally required to do that causes the deprivation of which

26  complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

1    Moreover, supervisory personnel are generally not liable under § 1983 for the

2    actions of their employees under a theory of respondeat superior and, therefore, when a named

3    defendant holds a supervisorial position, the causal link between him and the claimed

4    constitutional violation must be specifically alleged.  See Fayle v. Stapley, 607 F.2d 858, 862

5    (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978).  Vague and conclusory

6    allegations concerning the involvement of official personnel in civil rights violations are not

7    sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th Cir. 1982).

8    II.  The Eighth Amendment and Inadequate Medical Care

9    The unnecessary and wanton infliction of pain constitutes cruel and unusual

10   punishment prohibited by the Eighth Amendment.  Whitley v. Albers, 475 U.S. 312, 319 (1986);

11   Ingraham v. Wright, 430 U.S. 651, 670 (1977); Estelle v. Gamble, 429 U.S. 97, 105-06 (1976).

12   In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove

13   that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials

14   acted with deliberate indifference in allowing or causing the deprivation to occur.  Wilson v.

15   Seiter, 501 U.S. 294, 298-99 (1991).

16   Where a prisoner's Eighth Amendment claims arise in the context of medical

17   care, the prisoner must allege and prove "acts or omissions sufficiently harmful to evidence

18   deliberate indifference to serious medical needs."  Estelle, 429 U.S. at 106.  An Eighth

19   Amendment medical claim has two elements:  "the seriousness of the prisoner's medical need

20   and the nature of the defendant's response to that need."  McGuckin v. Smith, 974 F.2d 1050,

21   1059 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133

22   (9th Cir. 1997) (en banc).

23   A medical need is serious "if the failure to treat the prisoner's condition could

24   result in further significant injury or the 'unnecessary and wanton infliction of pain.'"

25   McGuckin, 974 F.2d at 1059 (quoting Estelle, 429 U.S. at 104).  Indications of a serious medical

26   need include "the presence of a medical condition that significantly affects an individual's daily

activities." Id. at 1059-60.  By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

If a prisoner establishes the existence of a serious medical need, he must then show that prison officials responded to the serious medical need with deliberate indifference. Farmer, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or may be shown by the way in which prison officials provide medical care.  Hutchinson v. United States, 838 F.2d 390, 393-94 (9th Cir. 1988).  Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06).  See also Toguchi v. Soon Hwang Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."); McGuckin, 974 F.2d at 1059 (same).  Deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'"  Farmer, 511 U.S. at 835 (quoting Whitley, 475 U.S. at 319).

Delays in providing medical care may manifest deliberate indifference.  Estelle, 429 U.S. at 104-05.  To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful.  See Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994); McGuckin, 974 F.2d at 1059; Wood v. Housewright, 900 F.2d 1332, 1335 (9th Cir. 1990); Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989); Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985).  In this regard, "[a] prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs."  Jett

1    v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).  See also McGuckin, 974 F.2d at 1060.

2          Finally, mere differences of opinion between a prisoner and prison medical staff

3    or between medical professionals as to the proper course of treatment for a medical condition do

4    not give rise to a § 1983 claim.  Toguchi, 391 F.3d at 1058; Jackson v. McIntosh, 90 F.3d 330,

5    332 (9th Cir. 1996); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Franklin v. Oregon, 662

6    F.2d 1337, 1344 (9th Cir. 1981).

7    III.  Qualified Immunity

8          "Government officials enjoy qualified immunity from civil damages unless their

9    conduct violates 'clearly established statutory or constitutional rights of which a reasonable

10   person would have known.'"  Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting

11   Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  When a court is presented with a qualified

12   immunity defense, the central questions for the court are (1) whether the facts alleged, taken in

13   the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a

14   statutory or constitutional right and (2) whether the right at issue was "clearly established."

15   Saucier v. Katz, 533 U.S. 194, 201 (2001).

16         Although the court was once required to answer these questions in order, the

17   United States Supreme Court has recently held that "while the sequence set forth there is often

18   appropriate, it should no longer be regarded as mandatory."  Pearson v. Callahan, 555 U.S. 223,

19   ___, 129 S. Ct. 808, 818 (2009).  In this regard, if a court decides that plaintiff's allegations do

20   not make out a statutory or constitutional violation, "there is no necessity for further inquiries

21   concerning qualified immunity."  Saucier, 533 U.S. at 201.  Likewise, if a court determines that

22   the right at issue was not clearly established at the time of the defendant's alleged misconduct,

23   the court may end further inquiries concerning qualified immunity at that point without

24   determining whether the allegations in fact make out a statutory or constitutional violation.

25   Pearson, 129 S. Ct. at 818-21.

26   /////

1    In deciding whether the plaintiff's rights were clearly established, "[t]he proper

2 inquiry focuses on whether 'it would be clear to a reasonable officer that his conduct was

3 unlawful in the situation he confronted' . . . or whether the state of the law [at the relevant time]

4 gave 'fair warning' to the officials that their conduct was unconstitutional." Clement v. Gomez,

5 298 F.3d 898, 906 (9th Cir. 2002) (quoting Saucier, 533 U.S. at 202). The inquiry must be

6 undertaken in light of the specific context of the particular case. Saucier, 533 U.S. at 201.

7 Because qualified immunity is an affirmative defense, the burden of proof initially lies with the

8 official asserting the defense. Harlow, 457 U.S. at 812; Houghton v. South, 965 F.2d 1532, 1536

9 (9th Cir. 1992); Benigni v. City of Hemet, 879 F.2d 473, 479 (9th Cir. 1989).

10                    **DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

11   I. Defendants' Statement of Undisputed Facts and Evidence

12    Defendants statement of undisputed facts is supported by citations to a declaration

13 signed under penalty of perjury submitted by defendant Naku, citations to copies of plaintiff's

14 medical records, inmate appeals and health care services request forms.

15    The evidence submitted by the defendants establishes the following facts.

16 Plaintiff was admitted to the California Department of Correction ("CDCR") on February 11,

17 2002, and housed at the San Quentin Reception Center. On February 20, 2002, plaintiff

18 underwent a physical examination. The evaluating doctor noted scales on plaintiff's scalp,

19 believed that the scales were the result of psoriasis and prescribed TAC ointment, ZNP shampoo,

20 and zinc pyrithione soap. (Defs. Noriega & McMaster SUDF (Doc. No. 94) 1, 4-5.)

21    Psoriasis is a chronic disease that commonly causes red scaly patches on the skin.

22 Common initial treatment for psoriasis is medicated topical ointments and creams, such as

23 Donovex Cream. Because it is a chronic disease flare-ups may occur and treatment of the

24 condition is often challenging. (Def. Naku's SUDF (Doc. No. 88-2) 18-20.)

25    On April 9, 2002, plaintiff was seen by Dr. Krishna after complaining of a rash all

26 over his body, scalp and stomach. Plaintiff also complained of stomach cramps. Dr. Krishna

1   observed that plaintiff had circular lesions with scaly boarders, and that his scalp had scaling and

2   areas of scaring.  The TAC ointment and shampoo were continued, Benadryl was  prescribed and

3   plaintiff was scheduled for a consultation with a dermatologist.  (Defs. Noriega & McMaster

4   SUDF (Doc. No. 94) 6.)

5              Plaintiff was examined by a dermatologist on June 24, 2002 and it was noted that

6   he had a ten to eleven year history of skin problems, with scales and hyper pigmentation on his

7   lower legs, and scales on his scalp.  Plaintiff was diagnosed with atopic dermatitis and possibly

8   psoriasis.[4]  (Defs. Noriega & McMaster SUDF (Doc. No. 94) 7; Def. Naku's SUDF (Doc. No.

9   88-2) 7-8.)   At that time plaintiff was proscribed ZNP bar shampoo, fluocinomide ointment,

10  petroleum jelly, Nizarol shampoo, and selenium sulfide.  (Def. Naku's SUDF (Doc. No. 88-2) 9-

11  11, 14-16.)

12             Plaintiff had a follow-up appointment with a dermatologist on September 23,

13  2002.  The doctor discontinued the fluocinomide ointment and prescribed clobetasol ointment.

14  Another follow-up appointment was schedule for the following month.  (Defs. Noriega &

15  McMaster SUDF (Doc. No. 94) 11.)

16             Plaintiff was examined by Dr. Luca on October 17, 2002, after complaining of

17  scalp problems.  Plaintiff informed Dr. Luca that the scars on his scalp were due to a chemical

18  burn he had received fifteen years prior.  Plaintiff requested that something be placed over the

19  areas of his scalp where he was experiencing alopecia, but Dr. Luca denied the request as being

20  cosmetic in nature.  Plaintiff was advised to comb his hair differently to hide the scars.  Plaintiff

21  saw the dermatologist a few days later and that doctor continued the previously prescribed

22

23        [4] Dermatitis is an inflammation of the skin in which the skin easily reacts to irritants and
becomes red, flaky and itchy.  There are several different types of dermatitis, which is generally
24  caused by an allergic reaction.  Common initial treatment for dermatitis includes antihistamines,
calamine lotion, hydrocortisone creams, corticosteroid creams, petroleum jelly, fluocinomide
25  ointment, and selenium sulfide.  Other treatments commonly administered include special soaps
and shampoos that relieve the itching, irritation, and skin flaking caused by dermatitis.  Those
26  soaps and shampoos include ZNP bar soap, Pyrithione Zinc bar soap, Dove soap, Nizarol
shampoo, and Selsun shampoo.

treatment plan without modification.  (Defs. Noriega & McMaster SUDF (Doc. No. 94) 13-14.)

On July 14, 2003, plaintiff filed administrative grievances claiming that he had nine spots on his head and that the medicated shampoo prescribed for him by prison medical staff was ineffective.  Plaintiff requested that the spots be surgically removed.  On August 6, 2003, plaintiff was examined by a doctor in response to his inmate grievance.  The doctor noted that plaintiff had spots all over his head for a year and that scabs were present and occasionally came off.  The examination found dandruff on plaintiff's scalp, localized areas of alopecia, hypo-pigmentation and scarring.  No skin swelling, open ulcers or bleeding was observed.  The doctor found that surgery was not medically indicated and instructed plaintiff to continue using his prescribed shampoos.  (Defs. Noriega & McMaster SUDF (Doc. No. 94) 15; Def. Naku's SUDF (Doc. No. 88-2) 21-25.)

On September 9, 2003, plaintiff was again seen by a doctor in response to an inmate grievance in which plaintiff had requested that the lesions on his scalp be surgically removed.  An examination of plaintiff's scalp revealed healed areas with no plaques or scabs.  Plaintiff admitted that the shampoo he was using had helped the condition but he still wanted the lesions removed surgically.  Once again it was determined by the examining doctor that surgery was not medically indicated and plaintiff's request was denied.  (Defs. Noriega & McMaster SUDF (Doc. No. 94) 20; Def. Naku's SUDF (Doc. No. 88-2) 26-29.)

On October 9, 2003, Dr. Rosenthal ordered a biopsy of one of the lesions on plaintiff's scalp, believing that the results would indicate what type of treatment would most effectively alleviate plaintiff's condition.  The biopsy was twice delayed due to institutional emergencies but was finally performed on June 7, 2004.  The biopsy resulted in a diagnosis of psoriasis associated with scaring.  Thereafter, plaintiff submitted another administrative grievance again requesting that the sores and scabs on his scalp be surgically removed.  On June 14, 2004, that grievance was granted at the director's level of review and it was ordered that plaintiff be provided the "minor surgery" ordered on October 9, 2003, by Dr. Rosenthal.

1   However, the only minor surgery ordered by Dr. Rosenthal on October 9, 2003, was the biopsy

2   that was performed on June 7, 2004.  A handwritten notation on the director's level response

3   noted that "minor surgery" was "done 6-7-04.  Bx of scalp lesion."[5]   (Defs. Noriega & McMaster

4   SUDF (Doc. No. 94) 21-25; Def. Naku's SUDF (Doc. No. 88-2) 30-36.)

5   Plaintiff was next examined by medical staff on September 1, 2004 and again

6   requested that the scars on his scalp be surgically removed.  Plaintiff was informed that surgery

7   could lead to further scarring and keloid formation.  It was noted that plaintiff already had a

8   keloid scar in the area of his right elbow.  A keloid scar is one that originates at the site of a

9   healed skin injury but grows over time and extends beyond the wound site.  (Def. Naku's SUDF

10  (Doc. No. 88-2) 37-40.)

11  Plaintiff was transferred to California State Prison, Solano ("CSP-Solano") on

12  March 6, 2006, and underwent an initial medical screening exam at that institution on March 9,

13  2006.  During 2006, defendants Noriega and Naku were employed by CDCR at CSP-Solano as

14  doctors.  Defendant McMaster was also employed at CSP-Solano during 2006 as a Medical

15  Technical Assistant ("MTA").  (Defs. Noriega & McMaster SUDF (Doc. No. 94) 2-3; Def.

16  Naku's SUDF (Doc. No. 88-2) 1-2.)

17  On March 13, 2006, plaintiff was seen at a prison satellite clinic complaining of

18  stomach pain.  He was examined by Dr. Thor, who noted that plaintiff had a history of upper

19  gastro-intestinal problems.  Dr. Thor completed a standard abdominal examination of plaintiff

20  and prescribed Pepsid and Maalox tablets.  Plaintiff returned to the clinic two days later on

21  March 15, 2006, complaining that the prescribed medication was not working.  Nurse McDonald

22  scheduled plaintiff for a routine appointment to see a doctor.  A routine appointment is to take

23  place within fourteen calendar days.  On March 24, 2006, plaintiff filed an administrative

24  grievance claiming that MTA Castrillo denied him adequate medical attention on March 15,

25

26      [5] "Bx" is an abbreviation for the word "biopsy."

1   2006.  (Defs. Noriega & McMaster SUDF (Doc. No. 94) 27-29.)

2           On April 13, 2006, plaintiff submitted a sick-call slip requesting that he be

3   provided with the "minor surgery" that he had been granted in the June 14, 2004 director's level

4   review discussed above.  However, as noted, that "minor surgery" was the June 7, 2004 biopsy

5   procedure plaintiff had already undergone.  (Defs. Noriega & McMaster SUDF (Doc. No. 94) 30;

6   Def. Naku's SUDF (Doc. No. 88-2) 41-42.)

7           Plaintiff was examined by Family Nurse Practitioner ("FNP") Mahon on April 27,

8   2006.  FNP Mahon changed plaintiff's medications, deleting Pepsid and proscribing Prilosec four

9   times a day for twelve weeks.  FNP Mahon also sent a request for services to defendant Noriega,

10  asking for an evaluation for the possible surgical removal of plaintiff's scalp lesions.  (Defs.

11  Noriega & McMaster SUDF (Doc. No. 94) 31-32.)

12          Plaintiff was seen by defendant Noriega on June 1, 2006.  Plaintiff again

13  requested that the scars on his scalp be surgically removed and that the skin be sutured together.

14  Defendant Noriega noted that plaintiff had sustained chemical burns in spots on his scalp and

15  that he had a biopsy on June 7, 2004, the results of which showed psoriasis associated with

16  scarring.  Defendant Noriega denied plaintiff's request to have the scars on his scalp surgically

17  removed because there was no medical indication for such surgery.  Defendant Noriega did

18  recommend that plaintiff use steroid cream on the areas of his scalp where he was experiencing

19  alopecia.  (Defs. Noriega & McMaster SUDF (Doc. No. 94) 33; Def. Naku's SUDF (Doc. No.

20  88-2) 43-44.)

21          On June 13, 2006, plaintiff was examined at a prison annex clinic by Dr. Rallos

22  due to complaints of stomach pain and spitting up blood.  Plaintiff told Dr. Rallos that his

23  stomach pain occurred every once in a while, was not as painful as it had once been and that

24  there had not been any blood in his mucus for a month.  (Defs Noriega & McMaster SUDF (Doc.

25  No. 94) 34.)

26  /////

1          Defendant Dr. Naku examined plaintiff on August 16, 2006 and found that he had

2   a greasy scalp with a few hyper-pigmented scars with scales.  Plaintiff also was found to have

3   multiple circular scaly lesions on his body but his physical examination was otherwise

4   unremarkable.  Hypo-pigmented scars are those that result from wounds to the skin deep enough

5   to damage the pigment-producing layers of the skin that give the skin its color.  Treatment for

6   hypo-pigmented scars is generally justified only on cosmetic grounds.  Excision of hypo-

7   pigmented scars is one treatment option, though it can commonly lead to the development of an

8   even larger scar since the skin will inevitably scar whenever it is cut.  Excision is not an option

9   when a patient is demonstrating an increased incidence of keloid scars.  On August 16, 2006,

10  defendant Dr. Naku diagnosed plaintiff as suffering from contact dermatitis.  (Def. Naku's SUDF

11  (Doc. No. 88-2) 45-52.)

12          In examining plaintiff's hypo-pigmented scars and lesions, defendant Dr. Naku

13  found no medical indication justifying surgical removal of the scars and lesions.  According to

14  Dr. Nako, plaintiff had already shown a likely occurrence of keloid scars and there was a high

15  likelihood that surgical excision of his scars would create even larger scars.  Based on defendant

16  Dr. Naku's contact dermatitis diagnosis, he instructed plaintiff to stop applying greasy creams

17  and/or lotions to his scalp in the hope that they were the allergens causing the dermatitis.

18  Defendant Dr. Naku also prescribed plaintiff Selsun shampoo, hydrocortisone cream, Dove Soap,

19  Nasonex spray, ZNP bar soap and Benadryl.  (Def. Naku's SUDF (Doc. No. 88-2) 52-57.)

20          During his August 16, 2006 examination of plaintiff defendant Dr. Naku also

21  diagnosed plaintiff as suffering from a seizure disorder, hypertension, and H-Pylori gastritis.[6]

22  Defendant Naku prescribed plaintiff Hydrochlorothiazide for the hypertension, Bismuth,

23  Prilosec, Biaxin, and Metronidazole for the plaintiff's H-Pylori and called for a lab test to

24  _____

25          [6] H-Pylori is a stomach infection that can cause chronic inflammation of the stomach
    lining.  Common treatment for the condition is the use of antibiotics, such as Metronidazole and
26  Biaxin, to treat the infection and proton pump inhibitors, such as Prilosec, to treat the symptoms.
    These medications are commonly combined with the mineral Bismuth.

1   measure plaintiff's Dilantin level with respect to his seizure disorder.  Defendant Dr. Naku also

2   ordered that plaintiff undergo a follow-up examination.  (Dec. Naku (Doc. No. 88-4) at 6-7.)

3          Defendant Dr. Naku conducted a routine medication renewal for plaintiff on

4   September 18, 2006.  The renewal included plaintiff's prescriptions for petroleum jelly, Dove

5   soap, Selsun shampoo, and hydrocortisone cream.  Dr. Naku did not examine plaintiff on this

6   date.  (Dec. Naku (Doc. No. 88-4) at 7.)

7          In a follow-up examination on September 28, 2006, Dr. Naku found that plaintiff

8   had multiple psoriatic lesions, scalp scarring and alopecia, diagnosed a flare-up of psoriasis and

9   prescribed plaintiff Selsun Shampoo, Dovonex cream, Dove soap, and petroleum jelly.  (Def.

10  Naku's SUDF (Doc. No. 88-2) 58-59.)  At that time Dr. Naku determined that plaintiff's seizure

11  disorder was stable and found that plaintiff had mild epigastric tenderness.  Defendant Naku

12  diagnosed plaintiff with gastritis and H-Pylori and prescribed him Tetracycline, Bismuth and

13  Prilosec, all of which are standard medications for the treatment of gastritis and stomach

14  infections.  (Dec. Naku (Doc. No. 88-4) at 15.)

15         On October 11, 2006, Dr. Naku was informed that plaintiff wished to see him

16  again regarding his scalp condition and prescribed medications.  Dr. Naku was unable to meet

17  with plaintiff that day and never saw plaintiff again clinically, because Dr. Naku was transferred

18  to a different clinic within the prison as part of the regular rotation process.  (Def. Naku's SUDF

19  (Doc. No. 88-2) 60-61; Dec. Naku (Doc. No. 88-4) at 16.)

20  II.  Defendants' Arguments

21         Defense counsel argues that the defendants Naku, Noriega and McMaster are

22  entitled to summary judgment in their favor with respect to plaintiff's Eighth Amendment claim

23  because there is no evidence that they were deliberately indifferent to plaintiff's medical needs.

24  Defense counsel also argues that the defendants are entitled to qualified immunity and that, to the

25  extent plaintiff is asserting a state law claim of negligence, plaintiff has failed to plead his

26  compliance with the California Government Claims Act as required.  (Def. Naku Mem. of P. &

1   A. (Doc. No. 88-1) at 1, 7-14; Defs.' Noriega & McMaster Mem. of P. & A. (Doc. No. 93) at 3,

2   5-13.)

3          First, defense counsel contends that there is no evidence before the court that

4   defendant McMaster purposefully ignored or failed to respond to plaintiff's pain or medical

5   needs, or that defendant McMaster delayed plaintiff's treatment.  The evidence establishes that

6   plaintiff was not transferred to CSP-Solano until March 6, 2006, and underwent an initial

7   medical screening exam on March 9, 2006.  On March 13, 2006, he went to a prison clinic

8   complaining of stomach pain and was examined by Dr. Thor who prescribed Pepsid and Maalox.

9   Two days later, plaintiff returned to the clinic claiming that the medications were ineffective.  A

10  nurse referred plaintiff for a routine medical appointment.  On April 13, 2006, plaintiff submitted

11  another sick call slip complaining of stomach pain.  Plaintiff was examined by FNP Mahon on

12  April 27, 2006, who proscribed Prilosec four times a day for twelve weeks.  In this regard,

13  counsel for defendant McMaster argues there is no evidence before the court to support

14  plaintiff's claim that McMaster ever refused to treat or delayed plaintiff's treatment.  (Defs.'

15  Noriega & McMaster Mem. of P. & A. (Doc. No. 93) at 7-8.)

16         Defense counsel also contends that the evidence shows that defendant Noriega

17  examined plaintiff on only one occasion, on June 1, 2006, concerning plaintiff's request to

18  surgically remove the scars on his scalp.  Defendant Dr. Noriega determined that the surgery was

19  not medically necessary.  Counsel notes that this finding is consistent with the findings made by

20  every other doctor who treated plaintiff for his skin condition.  (Defs.' Noriega & McMaster

21  Mem. of P. & A. (Doc. No. 93) at 8-9.)

22         Next, counsel for defendant Dr. Naku contends that the evidence submitted in

23  connection with the pending motion shows that plaintiff's hypo-pigmented scars and lesions did

24  not require surgery.  In this regard, defense counsel notes that plaintiff had been examined by

25  numerous other doctors prior to being examined by defendant Naku and that each one determined

26  that the surgery plaintiff requested was not medically indicated.  Moreover, counsel points out, a

biopsy determined that plaintiff's lesions were the result of psoriasis with associated scarring, which was consistent with defendant Dr. Naku's diagnosis of plaintiff's condition.  Counsel argues, defendant Naku appropriately responded to plaintiff's medical needs associated with his dermatitis and psoriasis conditions with the standard course of treatment, which included proscribing allergy medication, hydrocortisone cream, and special soaps and shampoos.  (Def. Naku Mem. of P. & A. (Doc. No. 88-1) at 9-10.)

Defense counsel next argues that each of the defendants are entitled to qualified immunity and that their motions for summary judgment should be granted on that ground. Specifically, counsel contends that the evidence in this case does not establish that the defendants violated plaintiff's constitutional rights.  In addition, counsel contends that a reasonable person in the defendants' respective positions could have believed that their conduct was lawful.  (Def. Naku Mem. of P. & A. (Doc. No. 88-1) at 10-12; Defs.' Noriega & McMaster Mem. of P. & A. (Doc. No. 93) at 9-10.)

Finally, defense counsel argues that defendants are entitled to summary judgment in their favor with respect to plaintiff's state law  negligence claim because plaintiff has failed to comply with the requirements of the California Government Claims Act and because there is no triable issue of material fact.  (Def. Naku Mem. of P. & A. (Doc. No. 88-1) at 12-13; Defs.' Noriega & McMaster Mem. of P. & A. (Doc. No. 93) at 10-12.)

III.  Plaintiff's Opposition

Plaintiff has filed two oppositions to the two motions for summary judgment brought on behalf of defendants. However, neither of those oppositions comply with Local Rule 260(b), which requires a party opposing summary judgment to (1) reproduce each fact enumerated in the moving party's statement of undisputed facts and (2) expressly admit or deny each fact.  The opposing party is also required to cite evidence in support of each denial.  In the absence of the required admissions and denials, the court has reviewed plaintiff's arguments and evidence in an effort to discern whether plaintiff denies any fact asserted in defendants'

1  statements of undisputed facts and, if so, what evidence plaintiff has offered that may

2  demonstrate the existence of a disputed issue of material fact with respect to any of his claims.

3            Plaintiff's opposition to defendants' motions for summary judgment is supported

4  by copies of his medical records, inmate appeals, and health care services request forms, as well

5  as a declaration signed under penalty of perjury by plaintiff.  Plaintiff repeats his contention that

6  the defendants were both negligent and deliberately indifferent to his serious medical needs.

7  Specifically, plaintiff asserts that he frequently complained of severe abdominal pain, yet

8  defendant McMaster refused to allow him to enter the medical clinic thereby prohibiting plaintiff

9  from even being examined, let alone treated for his H-Pylori infection.  Moreover, plaintiff

10  contends that defendant Dr. Naku did not even examine plaintiff until nearly five months after

11  his first complaint and nearly two months after his blood test showed that he was suffering from

12  an H-Pylori infection.[7]  In this regard, plaintiff argues that defendants McMaster and Naku were

13  negligent and deliberately indifferent to his serious medical needs.  (Pl.'s Opp'n to Def. Naku's

14  Mot. for Summ. J. (Doc. No. 97) at 1-2; Pl.'s Opp'n to Defs.' Noriega & McMaster Mot. for

15  Summ. J. (Doc. No. 102) at 2-3.)

16  /////

17

18      [7] Plaintiff asserts for the first time in his opposition to defendants' motions for summary judgement that on June 1, 2006, he had complained to defendant Dr. Noriega that he had severe

19  abdominal pain and begged him to order "blood tests" but that defendant Dr. Noriega refused and instead focused entirely on treating plaintiff's scalp lesions.  (Pl.'s Opp'n to Defs.' Noriega &

20  McMaster Mot. for Summ. J. (Doc. No. 102) at 2-3.)  This allegation is not found anywhere in plaintiff's second amended complaint.  Indeed, the second amended complaint, with respect to

21  defendant Dr. Noriega, is concerned entirely with Dr. Noriega's alleged "depriv[ing] [plaintiff] of a minor surgery medically (sic) necessary."  (Doc. No. 25 at 3.)  Plaintiff is advised that an

22  opposition to a motion for summary judgment is not a proper vehicle for adding new claims to his complaint.  See Wasco Products, Inc. v. Southwall Technologies, Inc., 435 F.3d 989, 992 (9th

23  Cir. 2006) ("[T]he necessary factual averments are required with respect to each material element of the underlying legal theory . . . .  Simply put, summary judgment is not a procedural second

24  chance to flesh out inadequate pleadings."); Brass v. County of Los Angeles, 328 F.3d 1192, 1197-98 (9th Cir. 2003) (upholding district court's finding plaintiff had waived § 1983

25  arguments raised for first time in summary judgment motion where nothing in amended complaint suggested those arguments, and plaintiff offered no excuse or justification for failure

26  to raise them earlier); see also Simpson v. Lear Astronics Corp., 77 F.3d 1170, 1176 & n. 4 (9th Cir. 1995) (issues not raised in opening brief may not properly be raised in reply)

1    Plaintiff also contends that the scalp surgery he requested was not cosmetic in

2 nature because the lesions were concealed by his.  Instead, plaintiff asserts that his clearly stated

3 objective in requesting the surgery was to prevent infection.  In this regard, plaintiff argues that

4 defendants Naku and Noriega were negligent and deliberately indifferent to his serious medical

5 needs.  (Pl.'s Opp'n to Def. Naku's Mot. for Summ. J. (Doc. No. 97) at 1-3.)

6    Finally, plaintiff acknowledges that he did not comply with the California

7 Government Claims Act, but claims that he could not comply with those requirements because

8 the defendants took an excessive amount of time to respond to his inmate grievances.  (Pl.'s

9 Opp'n to Def. Naku's Mot. for Summ. J. (Doc. No. 97) at 1.)

10 IV.  Defendants' Reply

11    In reply, defense counsel argues that plaintiff has failed to offer any evidence

12 sufficient to establish a disputed material fact with respect to his claims and that the evidence

13 plaintiff has offered is unauthenticated and irrelevant.  Counsel also unnecessarily repeats the

14 argument regarding what the evidence before the court establishes, concluding that there is

15 absolutely no evidence that defendant McMaster ever refused plaintiff admission to the prison

16 medical clinic or delayed his treatment.

17    With respect to defendant Noriega, counsel contends that the evidence presented

18 to this court by defendants establishes that the one and only time defendant Noriega examined

19 plaintiff was on June 1, 2006.  During that examination plaintiff requested that defendant

20 Noriega surgically remove the scars on his scalp.  Defendant Noriega determined that surgical

21 removal of the scars was not medically necessary.  Defense counsel contends that plaintiff has

22 failed to offer any evidence that defendant Noriega's opinion in this regard was incorrect at all,

23 let alone a reflection of deliberate indifference to plaintiff's medical condition.  (Defs.' Noriega

24 & McMaster Reply (Doc. No. 100) at 5.)

25    With respect to defendant Naku, counsel contends that plaintiff has not alleged

26 that defendant Dr. Naku was aware of plaintiff's complaints of stomach pain until he examined

19

plaintiff on August 16, 2006.  Counsel also argues that the evidence presented by defendants demonstrates that the care defendant Dr. Naku provided plaintiff for his stomach pain as a result of his H-Pylori infection was appropriate and was consistent with the standard course of treatment for that condition. (Def. Naku Reply (Doc. No. 99) at 2-3.)

Additionally, with respect to plaintiff's scalp condition, counsel for defendant Dr. Naku notes that plaintiff continues to argue that his scalp surgery "had been previously approved twice" but that "[t]here was a mix-up on the part of" CDCR.  Counsel for defendant Naku contends that plaintiff's argument in this regard appears is premised on a lack of understanding of the fact that his approved scalp surgery was in fact merely for the biopsy that was in fact performed on June 7, 2004.  Morever, counsel repeats the contention that Dr. Naku's determination that there was no medical indication to justify surgery on plaintiff's scalp was consistent with the determination of every doctor who had previously examined plaintiff.  (Def. Naku Reply (Doc. No. 99) at 5.)

Finally, counsel repeats the arguments that defendants are entitled to qualified immunity because they violated no constitutional right and because their conduct was objectively reasonable and that plaintiff has admitted that he failed to comply with the California Tort Claims Act, requiring dismissal of the state law negligence claim.  (Def. Naku Reply (Doc. No. 99) at 4-5; Defs.' Noriega & McMaster Reply (Doc. No. 100) at 5-6.)

## ANALYSIS

I. Plaintiff's Serious Medical Needs

Based on the evidence presented by the parties in connection with the pending motions for summary judgment, the undersigned finds that a reasonable juror could conclude that plaintiff's skin condition and H-Pylori infection posed serious medical needs requiring treatment.  See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of

chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment."); see also Canell v. Bradshaw, 840 F. Supp. 1382, 1393 (D. Or. 1993) (the Eighth Amendment duty to provide medical care applies "to medical conditions that may result in pain and suffering which serve no legitimate penological purpose.").  Specifically, the record in this case demonstrates that plaintiff repeatedly sought and received medical care for his skin condition from medical personnel, including defendants Dr. Naku and Dr. Noriega.  The record also demonstrates that plaintiff repeatedly sought and received medical care for his H-Pylori infection from medical personnel, including defendant Dr. Naku.  In light of plaintiff's medical history as well as the observations and treatment recommendations by several doctors, a reasonable juror could conclude that failure to treat plaintiff's skin condition and H-Pylori infection, and the related pain, could result in "further significant injury" and the "unnecessary and wanton infliction of pain."  See, e.g., McGuckin, 974 F.2d at 1059.  Accordingly, resolution of the pending motions hinges on whether, based upon the evidence before the court, a rationale jury could conclude that the defendants responded to plaintiff's serious medical needs with deliberate indifference.  Farmer, 511 U.S. at 834; Estelle, 429 U.S. at 106.

II.  Defendants' Response to Plaintiff's Serious Medical Needs

The court finds that the defendants have borne their initial responsibility of demonstrating that there is no genuine issue of material fact with respect to the adequacy of the medical care provided to plaintiff.  First, with respect to defendant McMaster, a MTA, plaintiff has failed to offer any evidence whatsoever to support his claim that MTA McMaster denied or delayed his medical care.  While plaintiff claims that MTA McMaster refused to allow him entry into the medical clinic and had him escorted out of the clinic, the evidence before the court demonstrates that plaintiff was transferred to CSP-Solano, where MTA McMaster worked, on March 6, 2006.  On March 9, 2006, plaintiff underwent an initial screening exam.  On March 13, 2006, plaintiff was examined by Dr. Thor at a satellite clinic after complaining of stomach pain.  On March 15, 2006, plaintiff returned to the clinic complaining that his prescribed medications

21

1   were not working.  At that time, a Nurse McDonald scheduled plaintiff for a routine

2   appointment.  On March 24, 2006, plaintiff filed an inmate appeal claiming that a MTA Castrillo

3   denied him medical attention.  There is no mention of MTA McMaster in plaintiff's inmate

4   appeal.  Indeed, although the treatment for plaintiff's stomach condition continued after these

5   dates, plaintiff has offered no evidence to the court that MTA McMaster was ever even involved

6   in plaintiff's care, let alone evidence that MTA McMaster ever denied or delayed his treatment in

7   any way.  Plaintiff does not even allege a date upon which he was allegedly denied entry into the

8   clinic.  (Defs.' Noriega & McMaster Ex. A & B-1 (Doc. No. 94-1) at 3, 21-22; B-2 & B-3 (Doc.

9   No. 94-2) at 17-18, 49-51; B-4 (Doc. No. 94-3) at 7.)

10           Next, with respect to defendant Dr. Naku, the evidence before the court

11   demonstrates that his first involvement with plaintiff's care was on August 3, 2006, when he

12   renewed plaintiff's prescriptions.  According to the submitted records, Dr. Naku did not examine

13   plaintiff until August 16, 2006.  On that date Dr. Naku examined plaintiff in response to

14   plaintiff's inmate appeal concerning the treatment of his scalp condition.  Dr. Naku reviewed

15   plaintiff's medical history and examined his scalp.  Dr. Naku found that plaintiff had a greasy

16   scalp with a few hypo-pigmented scars with scales and had multiple circular scaly lesions on his

17   body.  Dr. Naku found no medical justification for surgical removal of the hypo-pigmented scars

18   and diagnosed plaintiff as suffering from contact dermatitis.  Dr. Naku instructed plaintiff to stop

19   applying greasy creams and/or lotions to his scalp and prescribed him Selsun shampoo,

20   hydrocortisone cream, Dove soap, Nasonex spray, ZNP bar soap and Benadryl.  During the

21   August 16, 2006, examine, defendant Dr. Naku also diagnosed plaintiff as having H-Pylori

22   gastritis and prescribed Bismuth, Prilosec, Biaxin, and Metronidazole.  (Dec. Naku (Doc. No. 88-

23   4) at 1-7; Def. Naku Ex. D. (Doc. No 88-7) at 2-4.)  There is no evidence before the court that

24   Dr. Naku knew, or should have known, that plaintiff was suffering from an H-Pylori infection

25   prior to August 16, 2006, when Dr. Naku first began treating plaintiff for that condition.

26   /////

22

1    On September 18, 2006, Dr. Naku again renewed plaintiff's medications without

2   examining him.  However, Dr. Naku did conduct a follow-up examination of plaintiff on

3   September 28, 2006, for both his scalp condition and his H-Pylori infection.  After this

4   examination Dr. Naku ordered Tetracycline, along with Bismuth and Prilosec, for plaintiff's H-

5   Pylori infection, and Selsun shampoo, Dovonex cream, Dove soap and petroleum jelly, in

6   response to a flare-up of psoriasis for his scalp condition.  Dr. Naku also ordered another follow-

7   up examination for plaintiff.  (Def. Naku Ex. E & F (Doc. No. 88-7) at 7, 9-12. )

8    Finally, with respect to defendant Dr. Noriega, the evidence before the court

9   demonstrates that he met with plaintiff on June 1, 2006 in response to FNP Mahon's request that

10   plaintiff be evaluated by a dermatologist for possible removal of his scalp lesions.  Dr. Noriega

11   noted plaintiff had sustained chemical burns on his scalp and that a biopsy had been performed

12   on June 7, 2004, which showed that plaintiff was suffering from psoriasis with associated

13   scarring.  Dr. Noriega determined that surgical removal of plaintiff's scars was not medically

14   indicated and recommended that plaintiff use steroid cream for isolated areas of alopecia.  (Defs.'

15   Noriega & McMaster Ex. B-2 (Doc. No. 94-2) at 12, 14.)

16    Given the evidence submitted to the court by defendants McMaster, Naku and

17   Noriega in support of their motion for summary judgment, the burden shifts to plaintiff to

18   establish the existence of a genuine issue of material fact with respect to his claims, including his

19   claim that the defendants demonstrated deliberate indifference to his serious medical needs.  As

20   noted above, to demonstrate a genuine issue, the opposing party "must do more than simply show

21   that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a

22   whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

23   issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

24    The court has considered plaintiff's oppositions to the pending motions for

25   summary judgement and his verified complaint.  On defendants' motion for summary judgment,

26   the court is required to believe plaintiff's evidence and draw all reasonable inferences from the

23

1  facts before the court in plaintiff's favor.  Drawing all reasonable inferences in plaintiff's favor,

2  the court concludes that plaintiff has not submitted evidence sufficient to raise a genuine issue of

3  disputed material fact with respect to his claim that the defendants responded to his serious

4  medical needs with deliberate indifference.  See Farmer, 511 U.S. at 834; Estelle, 429 U.S. at

5  106.

6        Specifically, plaintiff claims that the defendants were deliberately indifferent to

7  his medical needs because they refused to surgically remove the lesions on his head, which

8  plaintiff believes was authorized by the June 14, 2004, director's level review of his inmate

9  grievance.  First, the evidence before the court establishes that the "minor surgery" referred to in

10  the June 14, 2004 decision was, in fact, the biopsy that was ordered by Dr. Rosenthal on October

11  9, 2003, and performed on June 7, 2004.  (Defs.' Noriega & McMaster Ex.  B-4 (Doc. No. 94-3)

12  at 17.); Def. Naku Ex. C (Doc. No. 88-6) at 2, 14-16.)

13        Turning to plaintiff's claim that the appropriate treatment of his scalp condition

14  required surgery, it is clear that plaintiff's mere disagreement with doctors Noriega and Naku as

15  to the appropriate course of treatment of his scalp condition is insufficient to defeat defendants'

16  motions for summary judgment.   As a matter of law, a mere difference of opinion between a

17  prisoner and prison medical staff as to the proper course of medical care does not give rise to a §

18  1983 claim.  See Estelle, 429 U.S. at 107 ("A medical decision not to order an X-ray, or like

19  measures, does not constitute cruel and unusual punishment."); Toguchi, 391 F.3d at 1058;

20  Jackson, 90 F.3d at 332; Fleming v. Lefevere, 423 F. Supp. 2d 1064, 1070 (C.D. Cal. 2006)

21  ("Plaintiff's own opinion as to the appropriate course of care does not create a triable issue of

22  fact because he has not shown that he has any medical training or expertise upon which to base

23  such an opinion.").

24        Here, plaintiff has tendered no competent evidence demonstrating that the

25  diagnosis and course of treatment the defendants chose for plaintiff was medically unacceptable

26  under the circumstances or that defendant's refusal to surgically remove his lesions caused him

harm.  Indeed, Dr. Naku, Dr. Noriega, and every other doctor that has treated plaintiff believes that the surgical removal of plaintiff's scalp lesions would in fact cause him harm.

Plaintiff has also failed to provide the court with any competent evidence demonstrating that the defendants chose their diagnosis and course of treatment in conscious disregard of an excessive risk to plaintiff's health.  In fact, the details found in plaintiff's medical records as well as the frequency of his medical visits, with the defendants as well as other healthcare professionals, contradicts plaintiff's subjective belief that the defendants were deliberately indifferent to his medical needs.  As noted above, Dr. Naku and Dr. Noriega each examined plaintiff's scalp and prescribed him various medications in an effort to treat his condition and alleviate his symptoms.  Plaintiff has presented no evidence calling into question the course of treatment pursued or the level of medical care he was provided.

With respect to plaintiff's claim that Dr. Naku did not examine him until nearly five months after his first complaint of stomach pain and nearly two months after his blood test showed that he was suffering from an H-Pylori infection, plaintiff has provided no evidence that Dr. Naku was aware, or should have been aware, of plaintiff's H-Pylori infection until Dr. Naku first examined plaintiff on August 16, 2006.  The evidence before the court establishes that as of that date Dr. Naku immediately began treating plaintiff for the H-Pylori infection.

Plaintiff has also failed to present any evidence that defendant McMaster ever had contact with plaintiff, let alone evidence that defendant McMaster refused or delayed his medical care.  In this regard, plaintiff's recent allegation that defendant McMaster had him escorted out of the clinic is entirely unsupported by any evidence.[8]

---

[8]  The evidence before the court establishes that on March 13, 2006, plaintiff was seen at a prison satellite clinic complaining of stomach pain.  At that time he was examined by Dr. Thor, who noted his history of upper gastro-intestinal problems, completed a standard abdominal examination and prescribed Pepsid and Maalox tablets.  Plaintiff returned to the clinic two days later on March 15, 2006, complaining that the prescribed medication was not working. At that time a Nurse McDonald (not MTA McMaster) scheduled a routine appointment for plaintiff for to see a doctor.  It may be that plaintiff has confused Nurse McDonald and MTA McMaster.

1    　　　　Finally, plaintiff acknowledges that he has not complied with the California

2    Government Claims Act, while arguing that his failure to do so was caused by prison officials'

3    delay in responding to his administrative grievances.  (Pl.'s Opp'n to Def. Naku's Mot. for

4    Summ. J. (Doc. No. 97) at 1.)  Plaintiff fails to explain how the alleged delay of prison officials

5    prevented him from filing the required written claim with respect to actions that occurred over

6    four years ago.  Under the California Government Claims Act, also known as the California Tort

7    Claims Act (CTCA), a plaintiff may not maintain an action for damages against a public

8    employee unless a written claim has first been presented to the appropriate state entity and has

9    been acted upon by that entity.  See Cal. Gov't Code §§ 900.2, 910, 915(c)(2) & 945.4.  Failure

10   to present a timely claim against a public employee bars a subsequent civil action for damages

11   against the public employee.  See State v. Superior Ct. ex rel. Bodde, 32 Cal.4th 1234, 1237,

12   1239 (2004); Willis v. Reddin, 418 F.2d 702, 704 (9th Cir. 1969).  Thus, state tort claims in a

13   federal court action brought pursuant to 42 U.S.C. § 1983 must allege compliance with the claim

14   presentation requirement.  United States v. California, 655 F.2d 914, 918 (9th Cir. 1980);

15   Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 627 (9th Cir. 1988); Butler v. Los

16   Angeles County, 617 F. Supp. 2d 944, 1001 (C.D. Cal. 2008).  Here, plaintiff  cannot now

17   comply with the CTCA claim filing requirement since his state law claims accrued over four

18   years ago and would be subject to dismissal in any event.  See Karim-Panahi, 839 F.2d at 627;

19   Nelson v. Runnels, No. CIV S-06-1289 LKK DAD P, 2009 WL 211052, at *6-7 (E.D. Cal. Jan.

20   28, 2009) (dismissing state claims for failure to comply with the CTCA).  Therefore, defendants

21   are entitled to dismissal of plaintiff's state law negligence claim as well.

22   　　　　Accordingly, for all of the foregoing reasons, the court concludes that the

23   undisputed evidence before the court establishes that defendants Naku, Noriega and McMaster

24   were not deliberately indifferent to plaintiff's serious medical needs and are entitled to summary

25   judgment in their favor with respect to plaintiff's Eighth Amendment claims and to dismissal of

26   plaintiff's state law negligence claim.

**CONCLUSION**

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendant Naku's April 28, 2010 motion for summary judgment (Doc. No. 88) be granted;

2. Defendants' Noriega and McMaster motion for summary judgment (Doc. No. 93) be granted;

3. Plaintiff's supplemental state law claims be dismissed; and

4. This action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 6, 2011.

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:6
smith2340.sj

27